IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

FILED

NEWMARKET CORPORATION,　　　　　)
a Virginia corporation, and　　　　　　　)
AFTON CHEMICAL CORPORATION,　　)
a Delaware corporation,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　)
　　　　Plaintiffs,　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　)
INNOSPEC LIMITED,　　　　　　　　　　)
a private limited United Kingdom　　　　　)
company,　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　)
　　　　Defendant.　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　)

201 MAY 13 ⱼ ₄ 37

CLERK US DISTRICT COURT
RICHMOND, VIRGINIA

Civil Action No. 3:11CV321

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiffs, NewMarket Corporation ("NewMarket") and Afton Chemical Corporation ("Afton"), by counsel, state the following as their Complaint against Defendant, Innospec Limited ("Innospec"):

## PRELIMINARY STATEMENT

1.　　　This action arises from Defendant's guilty plea in which it admitted to having bribed government officials in Indonesia to ensure ongoing sales in those countries of tetraethyl lead ("TEL"), Defendant's octane-boosting fuel additive, to the detriment of Plaintiffs and their sale of a competing and alternative octane-boosting fuel additive, methylcyclopentadienyl manganese tricarbonyl ("$mmt$®").[1]　Plaintiffs and Defendant are all manufacturers and exporters of octane-boosting fuel additives used in connection with the production of gasoline for motor

---

[1] MMT® and $mmt$® are registered trademarks of Afton Chemical Corporation.

vehicles. Defendant manufactures, sells and supplies TEL, which is a lead based octane-boosting fuel additive, as well as a range of non-lead based octane-boosting fuel additives.

2.     During all or part of the period in which the events described in this Complaint occurred, Defendant sold and supplied substantial amounts of TEL in a continuous and uninterrupted flow of, and which had a substantial effect on, interstate and foreign commerce.

3.     TEL has been a very profitable product for Defendant, and is or was a major source of its income. Defendant has enjoyed a monopoly market position in TEL production and sales, as well as a monopoly of the sale and supply of octane-boosting fuel additives in some countries such as Indonesia.

4.     *mmt®* is an octane-boosting fuel additive used in connection with the production of gasoline for motor vehicles. As more countries have transitioned to unleaded gasoline—and there has been growing pressure over time to do so because of the conversion to modern catalytic converters—Defendant has faced competitive pressure as new opportunities have been created for octane-boosting fuel additives that do not contain lead, principally *mmt®* sold by Plaintiffs.

5.     From at least 2000 and continuing through at least 2006, Defendant paid and promised payment of illegal bribes and kickbacks to Indonesian officials to obtain and maintain lucrative TEL sales, and to ensure that the government of Indonesia and/or relevant officials and entities favored TEL over *mmt®*.

6.     Defendant has admitted to the conduct described in this Complaint, has pleaded guilty to such conduct in a U.K. court, and has been sentenced in connection with such conduct. Copies of the Agreed Case Statement between Defendant and the U.K. Serious Fraud Office ("SFO") and related Opening Statement filed in the U.K. Southwark Crown Court are attached as Exhibits A and B, respectively, and the information and allegations contained therein are

2

incorporated by reference. A copy of a civil Complaint filed by the U.S. Securities and Exchange Commission ("SEC") relating to record-keeping and financial reporting violations by Defendant and its parent corporation, Innospec, Inc., in connection with the conduct described in this Complaint, is attached as Exhibit C and incorporated herein by reference.

7.      Defendant paid the bribes and other inducements to influence key government officials and various agencies of the Indonesian governments to achieve, maintain and exploit its monopoly of the octane boosting fuel additives (used in connection with the production of gasoline) sold in Indonesia and to foreclose Plaintiffs from selling their octane boosting fuel additives in that country.

8.      Defendant's conduct, in combination with that of its co-conspirators, did, in fact, foreclose the Indonesian markets to octane boosting fuel additives manufactured by Plaintiffs, and caused direct, substantial, proximate, immediate and reasonably foreseeable harm to Plaintiffs in the form of lost sales and lost profits.

9.      Defendant has combined, conspired and acted in concert with its co-conspirators to eliminate competition and unlawfully exclude Plaintiffs from selling octane boosting fuel additives in Indonesia.

## PARTIES

**A.      Plaintiffs**

10.      Plaintiff NewMarket Corporation is a corporation organized and existing under the laws of the Commonwealth of Virginia with its principal place of business in Richmond, Virginia. NewMarket is a global corporation—and the parent of various subsidiaries which it oversees and controls—that develops, manufactures and sells chemical additives, including octane-boosting fuel additives used in connection with the production of gasoline for motor

vehicles. NewMarket was organized as a holding company on or around July 1, 2004. Ethyl Corporation was the predecessor to NewMarket and became a wholly-owned subsidiary of NewMarket in or around July 2004.

11. Plaintiff Afton Chemical Corporation, a wholly-owned subsidiary of NewMarket, is incorporated in the State of Delaware and headquartered in Richmond, Virginia. Afton was formerly known as Ethyl Petroleum Additives, Inc. until it changed its name on or around July 1, 2004. Afton manufactures *mmt®* in the United States and sells and supplies it globally.

12. Plaintiffs are engaged in the business of exporting octane-boosting fuel additives from the United States.

**B.     Defendant**

13. Defendant Innospec Limited, previously known as Associated Octel Company, Ltd., is private limited company organized and existing under the laws of England and Wales. Defendant is a wholly owned subsidiary of Innospec, Inc., a corporation organized and existing under the laws of the State of Delaware with its executive offices in the United Kingdom. Defendant and its parent corporation, Innospec, Inc., manufacture and sell, among other things, fuel and power-related chemicals, including octane-boosting fuel additives such as TEL. In addition, the TEL Group is part of Innospec, Inc.'s Octane Additives Division and employees of the TEL group report to both Defendant and Innospec, Inc.

**C.     Co-Conspirators**

14. A number of unknown Indonesian officials have been involved in the conspiracies alleged herein through its agreements with Defendant to influence the relevant government agencies in Indonesia to purchase TEL exclusively and to exclude and foreclose sales of octane-boosting fuel additives manufactured by competitors, in particular by Plaintiffs. In exchange for

4

these agreements, Defendant has paid these officials millions of dollars over the course of the conspiracies. The specific identities of these officials are in the possession of Defendant and are unknown by Plaintiffs at the present time.

## JURISDICTION AND VENUE

15.     Plaintiffs' claims for injuries sustained by reason of Defendant's violations of Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c), are brought pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages, as well as the costs of this suit, including reasonable attorneys' fees.

16.     This Court has subject-matter jurisdiction over the Clayton Act and Robinson-Patman Act claims asserted in this Complaint, pursuant to 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. § 15. The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

17.     This Court has personal jurisdiction over Defendant under 15 U.S.C. §§ 15 and 22, Virginia Code § 8.01-328.1, and Federal Rule of Civil Procedure 4(k).

18.     Defendant has regularly transacted business in the Commonwealth of Virginia and has contracted to supply services or things in the Commonwealth of Virginia.

19.     Defendant has caused Plaintiffs tortious injury in the Commonwealth of Virginia by one or more acts committed outside the Commonwealth of Virginia, and Defendant has regularly solicited business, and/or engaged in a persistent course of conduct, and/or derived substantial revenue from goods used or consumed or services rendered, in the Commonwealth of Virginia as contemplated by Virginia Code § 8.01-328.1.

20.     Between 1993 and 2001, Defendant entered into at least four separate marketing and sales agreements with Ethyl and/or its subsidiaries, which have their principal place of

business in Richmond, Virginia. These agreements were negotiated with Defendant and entered into by Ethyl in Richmond, Virginia.

21.     On or around January 1, 1998, Defendant and Ethyl entered into a "Supply of Lead Antiknock Compounds Agreement" relating to the resale of TEL in the United States. The initial term of this agreement was five years, with a provision that it would continue for as long as Defendant manufactures or supplies TEL.

22.     On or around October 1, 1998, Defendant and Ethyl entered into an "Antiknock Marketing and Sales Agreement" relating to the marketing and sale of TEL in most markets outside the United States and Europe. The initial term of this agreement was twelve years. The agreement specified that it was to be "governed by, construed and enforced in accordance with the laws of the Commonwealth of Virginia."

23.     From January 2008 through March 2011, Defendant sold and supplied approximately $19 million dollars of TEL to Ethyl for resale by Ethyl in the United States only.

24.     Payment for the TEL sold and supplied by Defendant to Ethyl was made during all relevant times by wire transfer to Defendant initiated from Richmond, Virginia.

25.     Purchase orders for the TEL sold and supplied by Defendant to Ethyl were created in and transmitted from Richmond, Virginia to Defendant, and Defendant submitted invoices to Ethyl for the TEL.

26.     Representatives of Innospec traveled to Richmond, Virginia in October 2009 to solicit Afton's business for the supply of fuel additives. On or around October 6, 2009, representatives of Innospec and Afton met in Richmond, Virginia to review their existing business activities and discuss opportunities to expand sales between the companies. The

meeting was held at Innospec's request to re-establish ongoing dialogue on potential supply opportunities.

27.     Throughout the relevant period, Defendant authorized, directed and approved the activities of its agent, a company named PT Soegih Interjaya ("PTSI"), in paying and promising payment of illegal bribes and kickbacks to Indonesian officials to facilitate the sale and supply of TEL, and to block Plaintiffs' sale and supply of *mmt®* in Indonesia, thereby causing Plaintiffs tortious injury within the Commonwealth of Virginia. Defendant authorized and directed PTSI's activities through its officers and senior executives. Defendant also directly participated and engaged in the bribery of Indonesian officials. PTSI was Defendant's principal agent in Indonesia.

28.     Venue is proper in this District pursuant to 15 U.S.C. §15 and 28 U.S.C. §§1391(b) and (c).

## FACTUAL ALLEGATIONS

**A.      Defendant Bribed Indonesian Officials to Secure TEL Supply
Contracts and Prevent a Switch to an Unleaded Standard that
Would Have Foreclosed Further TEL Sales in Indonesia**

29.     Defendant, through its agents in Indonesia, paid bribes to Indonesian officials to win contracts for the sale and supply of TEL to state-owned refineries in Indonesia.

30.     Migas is the Indonesian Directorate General of Oil and Gas. BP Migas and BPH Migas are the Indonesian regulatory agencies that oversee fuel supplies and refining operations.

31.     Pertamina, the state-owned national oil and gasoline company in Indonesia, is a consumer of fuel additives and has purchased TEL from Defendant.

32.     PTSI acted as the principal agent of Defendant in Indonesia beginning in at least 1982. The principal of PTSI was Willy Sebastian ("Sebastian"). Sebastian was assisted by

Mohamed Syakir ("Syakir"). PTSI, Sebastian and Syakir were engaged by Defendant to conduct business in Indonesia. The activities of PTSI, Sebastian and Syakir were authorized and directed at all times by Defendant and its parent corporation, Innospec, Inc., through Innospec executives who were responsible for managing the TEL business in Indonesia.

33.     PTSI, Sebastian and Syakir, at all times relevant herein acting as agents for Defendant, facilitated the payment of bribes to and for the benefit of Indonesian officials.

34.     At least as early as 1999, Defendant began to obtain contracts in Indonesia, and has conducted substantial business there over time.

35.     From approximately 2000 to 2006, the government of Indonesia was considering transitioning to unleaded gasoline, which does not require TEL.  The effect of this would have been to end TEL sales in Indonesia.

36.     Starting in approximately 2000, the government of Indonesia expressed interest in transitioning from TEL to *mmt*®.  On or around April 12, 2000, representatives of Afton made a presentation about *mmt*® at Migas.

37.     In or around October 2000, a delegation of Indonesian officials, including representatives of Pertamina and Migas, traveled to Richmond, Virginia to meet with representatives of Afton.  During this visit, the Indonesian officials confirmed their interest in transitioning from TEL to *mmt*®.

38.     After their meeting with representatives of Afton, the delegation of Indonesian officials traveled to the United Kingdom to meet with representatives of Innospec.

39.     Notes taken during a meeting in December 2000 between Defendant and the Directorate General of Oil and Gas (Migas) at the Ministry of Energy and Mineral Resources

state: "Migas and Pertamina are coming under increasing pressure from the local EPA to introduce MMT [*sic*] before lead phase out is complete."

40.     Faced with this competitive threat and the impending loss of sales volume and profits, from approximately 2000 until 2006, Defendant, through its local agents, paid bribes to Indonesian officials, including from Pertamina and BP Migas, to induce the purchase of higher levels of TEL than Indonesia required and to cause the government of Indonesia not to switch to unleaded gasoline, thereby extending the life of TEL sales in Indonesia.

41.     In or around 2003, Pertamina ordered small amounts of *mmt*® in connection with laboratory tests conducted at the Cilicap refinery.

42.     On or around June 23, 2003, Migas sent a letter to the Indonesian Ministry of Environment ("MoE") seeking approval to use *mmt*® in Indonesia, and citing in support of its request the report of the 2003 risk assessment study, "The Risk of Manganese Exposure from Health Aspect in Indonesia," conducted by the University of Padjadjaran ("UNPAD") in Bandung, Indonesia, in consultation with MoE staff. The UNPAD report recommended that *mmt*® could be used as alternative octane booster replacing TEL in Indonesia.

43.     On or around February 6, 2004, Pertamina issued an economic evaluation report (based on the conditions at Pertamina's Cilicap refinery) confirming the cost savings of using *mmt*® as opposed to other non-lead based fuel additives (octane boosters).

44.     On or around November 1, 2004, Pertamina ordered 22 metric tons of *mmt*® from Afton, which was shipped to the Cilicap refinery in or around December 2004 for trial tests. Upon successful completion of the trial tests, Pertamina planned to order additional *mmt*® from Afton. This would have reduced the amount of TEL that Indonesia would have purchased from Defendant.

9

45.    In or around December 2004, Sebastian reported to Defendant, through an email to Innospec executives, that Pertamina was planning to stop using TEL and that the Cilicap refinery would be using *mmt*®.

46.    In or around December 2004, Sebastian sent an email to Defendant stating: "In mid December, I was assisted by [officials at] Migas to create a new strategy which is to forward a letter directly to the Director of Pertamina informing two important things. Firstly, TEL has to be continually used and secondly, Pertamina requires a formal recommendation from Migas and other related departments (e.g. ministry of finance and environment) for the usage of Octane Booster . . . ."

47.    In or around January 2005, Pertamina conducted trial tests of *mmt*® at the Cilicap refinery. On information and belief, the trial tests of *mmt*® were successful.

48.    On or around January 28, 2005, the MoE issued a letter in response to Migas' letter of June 23, 2003, objecting to the use of *mmt*® in Indonesia on the basis of precautionary principle. On information and belief, this objection was lodged at the request of Defendant and as a result of the payment of a bribe.

49.    On or around July 18, 2006, Pertamina sent a letter to Afton's agent in Indonesia requesting that Afton make a presentation on *mmt*® in connection with Pertamina's upcoming tender. Pertamina intended to publish a tender in or around September 2006 for a non-lead based fuel additive to raise the level of octane during the production of unleaded gasoline at three of its state-owned refineries, Plaju, Dumai and Balkipapan.

50.    On or around July 27, 2006, representatives of Afton made a presentation to Pertamina about *mmt*® and its use by the state-owned refineries.

51.     On or around August 3, 2006, Migas sent a letter to the MoE seeking a
determination of which types of non-lead based fuel additives (octane boosters) were permitted
for use in Indonesia.

52.     On or around October 3, 2006, the MoE sent a letter to Pertamina requesting
additional information about Pertamina's use of non-lead based fuel additives to raise the level of
octane during the production of unleaded gasoline.

53.     On or around October 19, 2006, Pertamina responded to the MoE's letter of
October 3, 2006, expressing its interest in reducing its dependence on the import of expensive
High Octane Mogas Component ("HOMC") to raise the level of octane during the production of
unleaded gasoline at its state-owned refineries, and further requesting an opportunity to make a
presentation to the MoE about non-lead based fuel additive (octane booster) options.

54.     On information and belief, on or around November 17, 2006, Pertamina made a
presentation to the MoE recommending the use of *mmt*® in Indonesia.

55.     On information and belief, in November 2006, representatives of Innospec met
secretly with the MoE.

56.     On or around November 20, 2006, MoE issued a letter endorsing the use of
ferrocene, an octane-boosting fuel additive manufactured by Defendant.  On information and
belief, this endorsement was issued at the request of Defendant and as a result of the payment of
a bribe.

57.     On or around November 22, 2006, an Innospec executive sent an email to another
Innospec executive stating:  "As you are aware, Indonesia was planning to go lead free in 2000
under the now defunct 'Blue Sky' programme, this obviously did not happen for a number of

reasons and since 1st January 2000 until the present, we have supplied 28,390 [metric tons] of TEL to Pertamina generating $277 million in revenue."

58.     As a direct and intended consequence of Defendant's payments to Indonesian officials, no additional *mmt®* was purchased by Pertamina for use by state-owned refineries.

59.     On information and belief, efforts by Defendant to bribe and otherwise improperly influence Indonesian officials to continue purchasing TEL continued through the end of 2006.

60.     Defendant has admitted that a number of its senior executives, including its then-Chief Executive Officer, were aware of and approved the bribe payments.

61.     Defendant, through its local agents, paid and agreed to make payments to Indonesian officials to secure bulk orders for TEL supply, facilitate payments to key individuals who could influence TEL purchases, block legislative efforts to ban or enforce a ban on TEL, and help achieve Defendant's short and long term marketing objectives. Defendant's actions prolonged the use of leaded fuel in Indonesia and prevent Indonesia from transitioning away from the use of TEL.

62.     On information and belief, the bribes were paid by PTSI, which was then reimbursed by Defendant. PTSI submitted false invoices to Defendant for reimbursement. These invoices purported to be for travel and other expenses, but in truth were for payments PTSI had made to Indonesian officials. Defendant knew the purpose of these payments, and reimbursed to PTSI the amounts requested by the false invoices.

63.     From 2000 to 2006, Defendant paid or promised payment of approximately $2,883,507 to Indonesian officials at BP Migas and Pertamina to secure TEL supply contracts, and to ensure that Defendant's TEL was the only octane-boosting fuel additive sold and supplied

in Iraq, which resulted in the exclusion of Plaintiffs and *mmt®*. Defendant earned approximately $21,506,610 in profits on those contracts.

**B.    Defendant's Use of U.S. Bank Accounts to Further its Unlawful Activities**

64.    The vast majority of Defendant's bribery in Indonesia was funded, directly and indirectly, through wire transfers and other payment methods that, upon information and belief, involved the use of bank accounts located in the United States.

65.    In all instances, Defendant's bribes were paid for its own benefit and were made with the involvement of its officials and/or representatives. Accordingly, in all instances the bribes, and their funding, were facilitated and carried out by Defendant.

66.    Defendant's use of U.S. bank accounts included any payment denominated in U.S. dollars, which upon information and belief, required either the direct use of a bank account maintained at a bank branch within the United States or, for transfers between non-U.S. bank accounts, required that the transaction clear through a U.S. branch of a non-U.S. bank involved in the transfer or through one or more correspondent accounts maintained at a bank branch within the United States.

67.    These U.S. dollar-denominated payments included most if not all of the improper payments paid by Defendant in Indonesia, as detailed in the allegations and admissions of Exhibits A and B, which are incorporated herein by reference and serve as the factual basis for Defendant's plea agreement with the SFO.

68.    Defendant participated in and is responsible for the foregoing payments because:

a.    it was directly or indirectly involved in the payments or was otherwise involved in the approval, authorization or facilitation of the payments;

b.     Defendant and its parent corporation, Innospec, Inc., maintain no separate corporate personality from one another; and/or

c.     Defendant and its parent corporation, Innospec, Inc., oversaw, directed, approved, authorized and/or controlled the activities of all the Innospec entities involved in the Indonesian bribery.

69.     The foregoing payments were, by their corrupt nature and by Defendant's affirmative efforts, concealed, kept secret and not disclosed to relevant parties, including but not limited to the Government of Indonesia, Migas, Lemigas, Pertamina, the Indonesian Ministry of Environment, Defendant's internal auditors, the SEC and the investing public, as supported by the allegations contained in Exhibits A and B—which are incorporated herein by reference and have been admitted by Defendant to be a fair and accurate description of the facts and/or serve as the factual basis for Defendant's plea agreement with the SFO—and the allegations contained in Exhibit C, which are incorporated herein by reference.

70.     Defendant concealed its illicit payments by, among other things, mischaracterizing or otherwise falsely representing or describing them in transaction and payment-related documents, books, records and accounts, ultimately resulting in the falsification of the corporate books, records and accounts and the creation and issuance of materially misleading financial statements and SEC filings, as supported by the allegations of Exhibits A and B—which are incorporated herein by reference and have been admitted by Defendant to be a fair and accurate description of the facts and/or serve as the factual basis for Defendant's plea agreement with the SFO—and the allegations contained in Exhibit C, which are incorporated herein by reference.

### C. U.K. Government Investigation into Innospec

71.     In or around February 2006, the SEC initiated a non-public investigation of Defendant regarding its financial reporting and possible violations of the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1 *et seq.*, and other laws in connection with Innospec Inc.'s involvement with the Oil for Food Program ("OFFP").

72.     In or around December 2006, the U.S. Department of Justice ("DOJ") opened a non-public investigation into Defendant's misconduct under the OFFP and identified evidence of additional bribery conduct.

73.     In or around May 2008, the SFO opened a non-public investigation into Defendant's misconduct under the OFFP, and in or around July 2008 opened a separate investigation into additional bribery conduct.

74.     The SEC, DOJ and the SFO coordinated their investigations.

75.     In the course of these investigations, evidence was uncovered and identified relating to bribery of Indonesian officials relating to the sale of TEL.

76.     On March 18, 2010, Innospec, Inc. pleaded guilty to a twelve-count indictment filed in the U.S. District Court for the District of Columbia for charges relating to kickbacks and bribes paid to Iraqi officials in connection with OFFP and post-OFFP contracts—all to obtain and maintain lucrative TEL sales, and to ensure that the government of Iraq favored TEL over *mmt*®.

77.     In connection with those charges, Innospec, Inc. admitted, agreed and stipulated to the information and allegations contained in the Plea Agreement and criminal Information filed in the U.S. District Court for the District of Columbia.

78.     On March 18, 2010, Innospec, Inc. entered into a settlement agreement with the SEC to resolve charges relating to payments made to Iraqi and Indonesian officials—all to obtain and maintain lucrative TEL sales, and to ensure that the governments of Iraq and Indonesia favored TEL over *mmt®*—and for related record-keeping and financial reporting violations. Defendant's financial results are and were consolidated with those of Innospec, Inc. A copy of the civil Complaint filed in the U.S. District Court for the District of Columbia is attached as Exhibit C and incorporated herein by reference.

79.     On March 18, 2010, Defendant pleaded guilty in the U.K.'s Southwark Crown Court to charges of bribing Indonesian officials to obtain and maintain lucrative TEL sales, and to ensure that the government of Indonesia favored TEL over *mmt®*.

80.     In connection with those charges, Defendant admitted, agreed and stipulated to the information and allegations contained in the Agreed Case Statement between Defendant and the SFO and related Opening Statement filed in the U.K.'s Southwark Crown Court, copies of which are attached as Exhibits A and B and incorporated herein by reference.

## FRAUDULENT CONCEALMENT

81.     Throughout the relevant period, Defendant never disclosed, and in fact affirmatively and fraudulently concealed, its unlawful conduct. Defendant and its parent corporation, Innospec, Inc., initially denied culpability during the course of the DOJ investigation and did not begin cooperating with DOJ until after the investigation had continued for more than a year.

82.     Additionally, by their very nature conspiracies and bribery schemes are inherently self-concealing.

83.     Plaintiffs did not discover, nor could they have discovered through reasonable diligence, that Defendant was violating federal and state laws until shortly before filing this Complaint because Defendant used deception and secret methods to avoid detection and to affirmatively conceal its violations in a manner that precluded detection. Defendant did not tell Plaintiffs that it was paying and promising to pay illegal bribes and kickbacks to Indonesian officials, and Plaintiffs had no reason to suspect that Defendant was engaging in such unlawful conduct to foreclose competition. Plaintiffs could not have discovered the violations alleged herein because Defendant conducted its illegal activities secretly, concealed the nature of its unlawful conduct and acts in furtherance thereof, and fraudulently concealed its activities through various other means and methods designed to avoid detection.

84.     In fact, Plaintiffs did not learn of the violations alleged herein until on or around March 18, 2010, when Defendant's guilty plea came to light.

85.     Defendant engaged in a successful and unlawful conspiracy and bribery scheme, which it affirmatively concealed, at least in the following respects:

    a.     By agreeing internally and with its agents at meetings and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of the illegal scheme;

    b.     By mischaracterizing all the illegal bribes and kickbacks paid to Indonesian officials as legitimate "commissions," "sales promotion expenditures" and other business expenses in Defendant's accounting books and records;

    c.     By requesting that Defendant's agents submit false invoices in connection with the bribes and kickbacks paid to Indonesian officials and by authorizing the

fictitious language that Defendant's agents were requested to include in the invoices that were submitted for payment;

      d.     By submitting false information in connection with Defendant's year-end financial statements filed with the SEC;

      e.     By intentionally creating the false appearance of competition by secretly bribing Indonesian officials to cancel an order for *mmt*® and to refrain from purchasing *mmt*® so that it would appear that *mmt*® was not as suitable for use by state-owned refineries as TEL.

86.     Defendant conducted its illegal activities secretly, concealed the nature of its unlawful conduct and acts in furtherance thereof, did not discuss publicly or otherwise reveal the nature and substance of its unlawful acts and communications in furtherance of its illegal scheme, mischaracterized all of the bribes and kickbacks paid to Indonesian officials as legitimate payments, and fraudulently concealed its activities through various other means and methods designed to avoid detection.

87.     As a result of the fraudulent concealment of the conspiracy and bribery schemes, all applicable statutes of limitations affecting Plaintiffs' claims have been tolled.

## TRADE AND COMMERCE AFFECTED

88.     At all times relevant, Defendant was engaged in the manufacture, marketing, distribution, sale and supply of octane-boosting fuel additives in many countries, including Indonesia. Defendant sold a substantial amount of octane-boosting fuel additives in foreign commerce in numerous countries around the world, including in Indonesia.

89.     The activities of Defendant, individually, and in conjunction with others as described herein, involved the use of bank accounts located in the United States.

90.    Because Plaintiffs were in direct competition with Defendant and its parent corporation, Innospec, Inc., for the marketing, distribution, sale and supply of octane-boosting fuel additives, Defendant's actions in eliminating and foreclosing competition in Indonesia had a direct, substantial, proximate, immediate and reasonably foreseeable adverse effect on Plaintiffs' export business in the United States.  Specifically, Plaintiffs were foreclosed and prevented from exporting octane-boosting fuel additives to Indonesia as a direct, substantial, proximate and immediate consequence of Defendant's activities.

91.    Thus, Defendant's business activities that are the subject of this Complaint were within the flow of and had a direct, substantial, immediate and reasonably foreseeable effect on domestic commerce and export commerce in the United States.

## COUNT I

### Unlawful Commercial Bribery in Violation of Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c)

92.    Plaintiffs reassert, reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

93.    Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c), provides that:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

94.     Defendant engages and has engaged in commerce, as contemplated by Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c), by selling and offering to sell TEL globally, including in Indonesia.

95.     Defendant, through its officers, employees and agents, has made undisclosed and illegal payments to Indonesian officials for the purpose of obtaining and maintaining contracts for the sale and supply of TEL to refineries in Indonesia, and preventing and excluding the sale by Plaintiffs of a product made in the United States. Defendant's illegal payments to Indonesian officials were made in U.S. dollars and involved the use of U.S. bank accounts. Defendant also has entered into several marketing and sales agreements with NewMarket and its subsidiaries relating to the sale and supply of TEL, has sold and supplied TEL inside and outside the United States, and has derived substantial revenue from those sales.

96.     These payments were not made for any services rendered in connection with the sale or purchase of TEL, and Indonesian officials did not provide any services to Defendant in return for these payments within the contemplation of 15 U.S.C. § 13(c).

97.     By paying and promising to pay bribes and kickbacks to Indonesian officials to obtain and maintain lucrative TEL sales, to ensure that the governments of Indonesia favored TEL over *mmt*®, and to prevent the sale and supply by Plaintiffs of *mmt*® in Indonesia, Defendant has engaged in commercial bribery in violation of Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c).

98.     The bribes and kickbacks were successful and achieved their intended effect in that Defendant obtained and maintained lucrative TEL sales and prevented Plaintiffs' sale and supply of *mmt*® in Indonesia.

99.     Defendant's bribery scheme is *per se* unlawful and constitutes *per se* competitive injury.

100.    This unlawful commercial bribery has injured Plaintiffs because they have been foreclosed from opportunities to market and sell *mmt®*. Had the competitive process not been thwarted by Defendant through its bribery scheme, Plaintiffs would have sold and supplied *mmt®* to Pertamina, and would have earned profits from the sale of *mmt®*. Defendant's illegal conduct harmed competition by precluding all competition from *mmt®*, the most viable substitute for TEL, and caused Plaintiffs to suffer injury thereby. Furthermore, Defendant's illegal conduct entirely foreclosed and eliminated competition from Plaintiffs.

101.    As a direct, substantial, proximate and immediate result of the foregoing unlawful conduct, Plaintiffs have suffered an antitrust injury and have been injured in their business, property, reputation and competitive position in an amount to be determined at trial.

102.    By reason of the foregoing and pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a), Plaintiffs are entitled to recover treble damages and their costs of this action, including their reasonable attorneys' fees.

## COUNT III

### Unlawful Commercial Bribery in Violation of the Virginia Antitrust Act, Virginia Code § 59.1-9.1 *et seq.*

103.    Plaintiffs reassert, reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

104.    The Virginia Antitrust Act, Virginia Code § 59.1-9.7(c), provides that:

> It is unlawful for any person engaged in commerce, in the course
> of such commerce, to pay or grant, or to receive or accept,
> anything of value as a commission, brokerage, or other
> compensation, or any allowance or discount in lieu thereof, except
> for and not exceeding the actual cost of such services rendered in

connection with the sale or purchase of goods, wares or merchandise.

105. Defendant engages and has engaged in commerce, as contemplated by the Virginia Antitrust Act, Virginia Code § 59.1-9.3, by selling and offering to sell TEL globally, including in Indonesia.

106. Defendant, through its officers, employees and agents, has made undisclosed and illegal payments to Indonesian officials for the purpose of obtaining and maintaining contracts for the sale and supply of TEL to refineries in Indonesia, and preventing and excluding the sale by Plaintiffs of a product made in the United States. Defendant's illegal payments to Indonesian officials were made in U.S. dollars and involved the use of U.S. bank accounts. Defendant also has entered into several marketing and sales agreements with NewMarket and its subsidiaries relating to the sale and supply of TEL, has sold and supplied TEL inside and outside the United States, and has derived substantial revenue from those sales.

107. These payments were not made for any services rendered in connection with the sale or purchase of TEL, and Indonesian officials did not provide any services to Defendant in return for these payments within the contemplation of the Virginia Antitrust Act, Virginia Code § 59.1-9.7(c).

108. By paying and promising to pay bribes and kickbacks to Indonesian officials to obtain and maintain lucrative TEL sales, to ensure that the governments of Indonesia favored TEL over *mmt*®, and to prevent Plaintiffs' sale and supply of *mmt*® in Indonesia, Defendant has engaged in commercial bribery in violation of the Virginia Antitrust Act, Virginia Code § 59.1-9.7(c).

109. The bribes and kickbacks were successful and achieved their intended effect in that Defendant obtained and maintained lucrative TEL sales and prevented Plaintiffs' sale and supply of *mmt®* in Indonesia.

110. Defendant's bribery scheme is *per se* unlawful and constitutes *per se* competitive injury.

111. This unlawful commercial bribery has injured Plaintiffs because they have been foreclosed from opportunities to market and sell *mmt®*. Had the competitive process not been thwarted by Defendant through its bribery scheme, Plaintiffs would have sold and supplied *mmt®* to Pertamina, and would have earned profits from the sale of *mmt®*. Defendant's illegal conduct harmed competition by precluding all competition from *mmt®*, the most viable substitute for TEL, and caused Plaintiffs to suffer injury thereby. Furthermore, Defendant's illegal conduct entirely foreclosed and eliminated competition from Plaintiffs.

112. Defendant's unlawful activities were directed specifically at causing harm to Plaintiffs by excluding *mmt®* from being sold in Indonesia, and otherwise causing harm to Plaintiffs' reputations and competitive positions. This included injury directed toward and suffered by Plaintiffs in Virginia, where Plaintiffs maintain their corporate headquarters and principal place of business.

113. As a direct, substantial, proximate and immediate result of the foregoing unlawful conduct, Plaintiffs have suffered an antitrust injury and have been injured in their business, property, reputation and competitive position in an amount to be determined at trial.

114. By reason of the foregoing, Plaintiffs are entitled to recover treble damages and their costs of this action, including their reasonable attorneys' fees. Virginia Code § 59.1-9.12(b).

## COUNT III

### Unlawful Conspiracy to Injure Another in its Trade or Business in Violation of the Virginia Business Conspiracy Act, Virginia Code § 18.2-499

115.    Plaintiffs reassert, reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

116.    The Virginia Business Conspiracy Act, Virginia Code § 18.2-499, makes it unlawful for a person to combine, associate, agree or mutually undertake with another, or to attempt to procure the participation, cooperation, agreement or assistance of another person, for the purpose of "willfully and maliciously injuring another in his reputation, trade or business" or for the purpose of "willfully and maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act."

117.    Through the actions described above, Defendant, through its officers, employees and agents, have attempted to procure the participation, cooperation, agreement and assistance of Indonesian officials, and have combined, associated, agreed, mutually undertaken and acted in concert with those Indonesian officials, for the purpose of willfully, maliciously and unlawfully injuring Plaintiffs in their reputation, trade or business. Specifically, as detailed above, Defendant has paid and promised to pay bribes and kickbacks to Indonesian officials to obtain and maintain lucrative TEL sales, to ensure that the governments of Indonesia favored TEL over *mmt®*, and to prevent the Plaintiffs' sale and supply of *mmt®* in Indonesia.

118.    At all relevant times, Defendant acted with legal malice, which is clearly evidenced by its commercial bribery of Indonesian officials with the express aim of obtaining and maintaining lucrative TEL sales and excluding Plaintiffs and *mmt®*.

119.    By conspiring to injure Plaintiffs in their trade and business, Defendant has violated the Virginia Business Conspiracy Act, Virginia Code § 18.2-499. Defendant's bribes

and kickbacks were successful and achieved their intended effect in that Defendant obtained and maintained lucrative TEL sales and prevented Plaintiffs' sale and supply of *mmt*® in Indonesia.

120.   This unlawful conspiracy to injure Plaintiffs in their trade and business has deprived Plaintiffs of the ability to sell and supply *mmt*® in Indonesia and caused Plaintiffs to suffer injury thereby.

121.   Defendant's unlawful activities were directed specifically at causing harm to Plaintiffs by excluding *mmt*® from being sold in Indonesia, and otherwise causing harm to Plaintiffs' reputations and competitive positions. This included injury directed toward and suffered by Plaintiffs in Virginia, where Plaintiffs maintain their corporate headquarters and principal place of business.

122.   As a direct, substantial, proximate and immediate result of the foregoing unlawful conduct, Plaintiffs have been injured in their business, property, reputation and competitive position in the sale and supply of octane-boosting fuel additives in an amount to be determined at trial.

123.   By reason of the foregoing, Plaintiffs are entitled to recover treble damages and their costs of this action, including their reasonable attorneys' fees. Virginia Code § 18.2-500.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court order, adjudge and decree:

A.   That Defendant's above-described acts constitute violations of the Robinson-Patman Act, 15 U.S.C. § 13(c), the Virginia Antitrust Act, Virginia Code § 59.1-9.7(c), and the Virginia Business Conspiracy Act, Virginia Code § 18.2-499.

B.   That Plaintiffs receive judgment against Defendant in an amount to be determined at trial, together with an award of pre-judgment and post-judgment interest;

C.      That all damages Plaintiffs have sustained as a result of Defendant's violations of

law be trebled;

D.      That Defendant be required to pay to Plaintiffs all reasonable attorneys' fees,

expenses and costs incurred by Plaintiffs in this action; and

E.      That Plaintiffs be granted such other and further relief as the Court may deem just

and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs respectfully request a trial by jury, pursuant to Federal Rule of Civil Procedure

38(b), on all matters so triable.


Dated:  May 13, 2011                           Respectfully Submitted,

                                               **NEWMARKET CORPORATION and
                                               AFTON CHEMICAL CORPORATION**
                                               By Counsel


                                               _____
                                               Howard Feller (VSB#18248)
                                               hfeller@mcguirewoods.com
                                               Robert M. Tyler (VSB#37861)
                                               rtyler@mcguirewoods.com
                                               Anne Marie Cushmac (VSB#38312)
                                               acushmac@mcguirewoods.com
                                               Alexander J. Brackett (VSB#67981)
                                               abrackett@mcguirewoods.com
                                               Matthew D. Fender (VSB#76717)
                                               mfender@mcguirewoods.com
                                               McGuireWoods LLP
                                               One James Center
                                               901 East Cary Street
                                               Richmond, Virginia  23219
                                               (804) 775-1000
                                               (804) 775-1061 (facsimile)
                                               *Counsel for NewMarket Corporation
                                                       and Afton Chemical Corporation*

26